

## *State of New Jersey*
### OFFICE OF ADMINISTRATIVE LAW

**FINAL DECISION**

OAL DKT. NO. EDS 07732-24

AGENCY DKT. NO. 2024-37476

**K.C. AND M.C. ON BEHALF OF C.C.,**

Petitioners,

v.

**HOLMDEL TOWNSHIP**

**BOARD OF EDUCATION,**

Respondent.

---

**K.C. and M.C.**, petitioners, pro se

**Eric L. Harrison**, Esq., for respondent, Holmdel Township Board of Education (Methfessel & Werbel, P.C., attorneys)

Record Closed: October 25, 2024          Decided: November 22, 2024

BEFORE **JACOB S. GERTSMAN**, ALJ t/a:

### STATEMENT OF THE CASE

Petitioners K.C. and M.C., the parents of minor child C.C. (parents), contend that respondent Holmdel Township Board of Education (District or Holmdel) failed in May and June 2022 to identify C.C. as a disabled child eligible for special education and denied her a free, appropriate public education (FAPE). The parents seek tuition

*New Jersey is an Equal Opportunity Employer*

OAL DKT. NO. EDS 07732-24

reimbursement for the costs of C.C.'s unilateral placement at the Ranney School (Ranney) for the 2022–2023 school year.  Holmdel contends that it did not violate its child-find responsibilities.

## PROCEDURAL HISTORY

On May 6, 2024, petitioners filed a due-process petition under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 to 1482, and the New Jersey special education regulations, N.J.A.C. 6A:1-1.1 to -10.2, against respondent.  The parents alleged that Holmdel failed to identify C.C., who attended Holmdel's schools from the 2018–2019 school year through the 2021–2022 school year, as a disabled child in need of special education and related services, and thus denied her a FAPE.  As relief, the parents sought tuition reimbursement for the costs of their unilateral placement of C.C. at Ranney, a private school that is not approved for special education, for the 2022–2023 school year through the 2026–2027 school year.

The parents' petition was transmitted to the Office of Administrative Law (OAL), where it was filed on June 7, 2024, as a contested case.  N.J.S.A. 52:14B-1 to -15; N.J.S.A. 52:14F-1 to -23.  The initial telephone hearing was held on June 13, 2024, where the parties asked for an adjournment in order to continue settlement discussions.  During the July 16, 2024, phone hearing, the parties agreed-on the schedule for evidentiary hearings and for the District to file a motion for summary decision.  The District's motion for summary decision was filed on July 24, 2024, and petitioners' opposition was filed on July 26, 2024.  On July 29, 2024, respondent informed my chambers that it would not be filing a reply brief.

On August 22, 2024, my order was issued, granting in part and denying in part respondent's motion, which is incorporated as though set forth herein.  (C-1.)  The motion for summary decision was granted with respect to the parents' claims regarding Holmdel's 2019 evaluations, tuition reimbursement for the 2023–2024 school year, and tuition reimbursement claims for the 2024–2025, 2025–2026, and 2026–2027 school years.  Those claims were dismissed.  The motion for summary decision with respect to the parents' claim for tuition reimbursement for the 2022–2023 school year was denied

2

OAL DKT. NO. EDS 07732-24

as I concluded that the correspondence between K.C. and school personnel in May and June 2022 was sufficient to raise a genuine issue of material fact whether Holmdel failed to then identify and evaluate C.C. for special education purposes, thus neglecting its child-find and FAPE duties in 2022.[1]  (Ibid.)

The first evidentiary hearing was held on September 16, 2024.  The District requested an adjournment of the second evidentiary hearing date, scheduled for September 30, 2024, due to a scheduling conflict for respondent's counsel with a trial date in Superior Court.  The request was granted over the objection of the parents. After discussions with the parties to determine their availability, the final evidentiary hearing was scheduled and held on October 25, 2024.  The parties submitted written closing arguments prior to the last hearing date, supplemented by an oral summation at the conclusion of the hearing, and the record was closed.

## FACTUAL DISCUSSION AND FINDINGS

### Undisputed Facts

In my order on the motion for summary decision, the following facts were found not to be in dispute and are incorporated herein.  (C-1 at 2–5):

C.C. was born in 2014 and lives with her parents in Holmdel.  In March 2019, while C.C. attended public school in Holmdel, K.C. and M.C. asked the school district to evaluate C.C. to determine her eligibility for special education and related services due to certain social, behavioral, and educational concerns the parents had about C.C.

In May and June 2019, the school district conducted psychological, educational, social, and occupational therapy evaluations of C.C. and, based on those evaluations, determined that C.C. did not have a disability adversely affecting her educational performance.

---

[1]  Following the issuance of my order, the parents re-enrolled C.C. in the District.

OAL DKT. NO. EDS 07732-24

In a June 5, 2019, letter, the school district informed the parents that C.C. was not eligible for special education and related services. That letter included notice of the parents' right to appeal the school district's eligibility determination. The parents did not appeal that determination by requesting mediation or a due-process hearing through the Office of Special Education.

In subsequent school years, the parents' interactions with the school district mainly involved parental concerns about other children or teachers bullying C.C. and masking and social distancing requirements during the COVID-19 pandemic. With respect to the latter issue, the parents obtained in October 2021 a medical exemption from the mask mandate for C.C. but complained that, as a result, the school district mistreated maskless C.C. by forcing her to sit in the back of the classroom.

For the 2019–2020, 2020–2021 and 2021–2022 school years, C.C. mostly received "Satisfactory" and "Outstanding" marks on her progress reports. In May 2022, however, the parents expressed concerns about C.C.'s educational performance in correspondence with the principal of C.C.'s school, Lisa Vitale (Vitale), and C.C.'s second-grade teacher, Alicia Del Buono (Del Buono). Specifically, in a May 26, 2022, email, K.C. wrote to Vitale that C.C. "has been scoring terribly on every assignment she brings home" and that "[h]er MAP [Measures of Academic Progress Test][2] scores are also terrible." According to K.C., "she does not appear to be learning," and "something seems to be very wrong." She wondered if C.C. "is not focusing on her academics despite her teacher's efforts, and this would be something we need to address at home," and asked if the principal could "investigate."

K.C. worried that C.C. "will need to repeat 2nd grade if she stays" at the school and informed Vitale that "[w]e have submitted an application at Ranney and will transfer her out of the school district if Holmdel cannot openly discuss this matter and ultimately meet her academic needs."

---

[2] The summary decision order incorrectly referred to the MAP test as "Measures of Academic Performance" and has been corrected here.

OAL DKT. NO. EDS 07732-24

In response, Vitale wrote:

> Thank you for your email and I can completely understand your concerns. I will investigate and speak to her teachers and definitely get back to you with some information next week. I am aware that test scores in MAP have dipped a bit this year and I am sure that is due to multiple causes, COVID, new F&P reading series, etc. Let me do some investigating and I will most certainly provide you with whatever information I can uncover.

Vitale discussed K.C.'s concerns with Del Buono who, on May 31, 2022, wrote K.C. a lengthy email about C.C.'s academic performance. In that email, Del Buono highlighted C.C.'s strengths and weaknesses in reading, spelling, and math. The teacher addressed C.C.'s MAP test scores from the Fall but did not appear to address her most recent test scores in January. The teacher noted that C.C.'s "biggest struggle is foundational literacy concepts in phonics, which negatively impact her writing and reading." Del Buono recommended summer school for C.C. as a way "to meet [her] needs."

On June 1, 2022, K.C. emailed Vitale and Del Buono about her concerns over C.C.'s decline in MAP test scores, ability to identify high-frequency words and math skills. In that email, K.C. also criticized the school district's COVID-19 policies and bemoaned C.C.'s classroom struggles during the pandemic.

The same day, Vitale emailed K.C. to tell her "I am so sorry to hear that [C.C.] suffered so much emotionally this year" and that "COVID has been extremely stressful for everyone and we continue to still see the after effects of all of it." She asked K.C. "to let us know if there is anything else we can do on our end to assist [C.C.] with her transition to 3rd grade."

In early June, the school offered, and K.C. accepted, C.C.'s placement in the school district's "Summer Step Up Program" for July and August 2022. On June 9, 2022, however, K.C. asked Del Buono for a letter of recommendation in support of C.C.'s application to Ranney, and later that month Del Buono provided K.C. with that

5

OAL DKT. NO. EDS 07732-24

letter.  Then, on July 13, 2022, the parents signed an enrollment/tuition agreement for C.C. to attend Ranney for the 2022–2023 school year and provided Ranney with a down payment on tuition.

By email dated August 22, 2022, the parents notified Holmdel's school board members that C.C. had enrolled at Ranney for the 2022–2023 school year and asked for her school records to be sent to Ranney.  Other than September and October 2023 correspondence about the school district's provision of transportation to and from Ranney, the parents and Holmdel did not interact or correspond during the 2022–2023 school year.

In July 2023, the parents privately arranged for C.C. to undergo a psychological/educational evaluation that resulted in a "Visual Processing Disorder" diagnosis for C.C.  In December 2023, the Monmouth-Ocean Educational Services Commission (MOESC) issued an Individualized Service Plan (ISP) for C.C. at Ranney. C.C. was classified as "Other Health Impaired," and the ISP provided for certain special education and related services, including modifications and supplementary aid and services.  And in February 2024, C.C. underwent a central auditory processing evaluation that revealed certain auditory processing difficulties.

On April 23, 2024, the parents wrote to Holmdel to request tuition reimbursement for C.C.'s attendance at Ranney for the 2022–2023 school year and the four school years thereafter due to Holmdel's alleged failure to identify and classify C.C. as a special education student and to provide her with a FAPE.

## Testimony

## For the District

**Dr. Amanda Lamoglia** (Dr. Lamoglia) is the Director of Special Services for the District and was qualified as an expert in special education.  She first learned about C.C. when the District received a letter from the parents in April 2024 requesting

6

reimbursement for tuition for Ranney.  Prior to this request, she did not receive any requests from the parents for C.C. to be evaluated.

She described the three-tiered support system utilized by the District to assess progress made by the student and whether intervention and referral to the child study team (CST) is needed.  The three tiers are used to exhaust all general education remedies prior to a referral to the CST to determine the need for special education services.  She noted that following the 2019 determination that C.C. was not eligible for special education services, the parents did not request a further evaluation by the CST.

Dr. Lamoglia reviewed C.C.'s records and found that her progress reports for her kindergarten year, 2019–2020, and her first-grade year, 2020–2021, indicated that she received an S for satisfactory or an O for outstanding in all areas.  She added that there were no red flags indicating that classification for special education services was warranted.  (R-8; R-9.)  Regarding the Measures of Academic Progress (MAP) tests conducted during the 2021–2022 school year, C.C. scored above average in reading. Her math scores dipped in the winter but rebounded to above average in the spring.  (R-10.)  She noted that dips in the winter MAP test scores are not uncommon, and in the winter of 2022, the District experienced a dip across the board.  Dr. Lamoglia is confident that these scores were accurate but agreed that the scores are not the only indicator that a student may need help.

Dr. Lamoglia testified that in her professional opinion, C.C.'s second-grade teacher, Alicia Del Buono, did not improperly fail to identify C.C. as a child in need of a referral for evaluation by the CST, the evaluations did not demonstrate a need for additional support, and the progress detailed by Del Buono in her emails to the parents (R-14) demonstrated meaningful progress.  It was her opinion that C.C. received a FAPE in the 2021–2022 school year.

**Alicia Del Buono** (Del Buono) was C.C.'s second-grade teacher during the 2021–2022 school year and is certified as a special education teacher.  She was qualified as an expert in elementary and special education.  Del Buono remembered

7

C.C. positively and described her as helpful and eager.  Del Buono had interactions with the parents throughout the school year at events and via email on occasion.

She is familiar with and described "child find."  When she determines that a student has difficulties, she utilizes the tiered interventions to determine the cause of the issue.  If the three tiers do not work, a student may be referred to the CST.  During that school year, she referred three students to the CST following the use of the three-tiered interventions.

C.C. received tier-one interventions since she was weaker in phonics, but she was not referred to the CST.  Del Buono worked with C.C. throughout the year, and while C.C. needed improvement in phonics and received an "N" on her progress report for each quarter, she was not moved to tier two since Del Buono found that she was continuing to make progress toward her goals.  Del Buono did not observe that C.C. had any emotional issues in school.  She also provided extra spelling work in response to K.C.'s request and emailed the parents her notes that she was going to use at the parent-teacher conference when K.C. informed her that she was not able to attend.  (R-20; R-27 at 194–195, 212.)

C.C. made adequate progress in reading for the year and was typical of the general education students in her class.  She still needed to be reminded to slow down when she did her work, which was typical for a second grader, and she also needed reminders to use proper phonics.  C.C. made progress with the Fountas & Pinnell running records system.  She began at Level H and completed the year at Level L, demonstrating a full year's growth.  (R-14; R-20.)  Del Buono did not believe that C.C. was in need of increased intervention despite being one level behind the ideal.

C.C.'s MAP scores were:  176 in mathematics and 162 in reading in the fall of 2020; 174 in mathematics and 172 in reading in the winter of 2020; 172 in mathematics and 169 in reading in the spring of 2021; 185 in mathematics and 185 in reading in the fall of 2021; 177 in mathematics and 182 in reading in the winter of 2021; and 200 in mathematics and 192 in reading in the spring of 2022.  (R-10.)  Del Buono noted that these scores dipped in the winter and rose in the spring in the 2021–2022 school year.

OAL DKT. NO. EDS 07732-24

While K.C. noted in her January 28, 2022, email notifying Del Buono that she could not attend the parent-teacher conference that "our biggest concern is that her grades are not good" (R-27 at 194), the parents did not express any further written or verbal concerns until their May 26, 2022, email to Vitale. (R-12.)  In response to that email, Del Buono provided a detailed summary of C.C.'s academic growth via email on May 31, 2022. (R-14.)  Del Buono testified that this email was an accurate description of how C.C. was doing.

Del Buono believed that despite some learning gaps in phonics, C.C. made meaningful progress with the tier-one interventions and therefore did not need to move to Tier 2 interventions.  She did not observe any adverse educational impact on account of a visual processing disability in C.C.  The parents brought up retention for C.C., but she disagreed as it would do more harm than good. (R-14.)  She recommended that C.C. attend the Summer Step Up Program, but while K.C. initially expressed an interest in the program, C.C. did not attend. (R-15; R-16.)  Del Buono wrote a letter of recommendation for C.C. to attend Ranney at the parents' request. (R-16; R-17.)

Del Buono testified on cross-examination that there was steady growth in C.C.'s reading and that she was improving in phonics.  C.C. was always able to get through her work, and rushing was not a sign of a visual processing disorder.  Homework was provided in compliance with District policy; however, Del Buono provided additional reading lists and spelling words to accommodate the requests of the parents.  She reiterated that her May 31, 2022, email to the parents describing C.C.'s academic progress consisted of her own words based on her own assessments.

**For the Parents**

**Lisa Vitale** (Vitale) was the principal of the Village School, where C.C. attended, in the 2021–2022 school year.  She has no background in special education but was involved as a part of her administrative duties and coordinated with the Director of Special Services and the CST.  She believed that Del Buono definitely had the ability to

identify children with special needs.  She stated that when a parent emails with concerns, she goes "right to the teacher."

Vitale recalled positive interactions with K.C. during that school year, which primarily dealt with masking issues during the COVID-19 pandemic.  She tried to accommodate K.C.'s concerns.  She also recalled K.C.'s May 26, 2022, email expressing concerns with C.C.'s academic progress, and she noted that it was a concern that the parent brought up retention since it does not come up often.  She went directly to Del Buono to address the parents' concerns, and Del Buono did not agree that retention was appropriate.  She noted that teachers will email the administration asking if a response to a parent looks ok, which is what Del Buono did in this case.

Vitale did not recall being involved in other discussions about C.C. other than those regarding masking issues.  Finally, she explained that her June 29, 2022, email stating that it was "in everyone's best interest" referred to the recommendation for C.C. to attend Ranney.  She was concerned that the request had slipped through the cracks, and she did not want C.C.'s potential admission to be held up.

**Dr. Megan Brown** (Dr. Brown) is a licensed psychologist and was qualified as an expert in psychology.  She was recommended to the parents by the staff at Ranney, who then reached out to her in December 2022.  Dr. Brown evaluated C.C. in July 2023, observed C.C. at Ranney in September 2023, and issued a report that diagnosed C.C. with a Visual Processing Disorder.  (P-5 at 17.)  Dr. Brown did not have C.C.'s 2019 evaluation and stated that it would have helped.

On cross-examination, she conceded that she did not see any of C.C.'s testing scores from Holmdel and only saw the emails from the teacher.  She recalled seeing the May 31, 2022, email from Del Buono to the parents (R-14) and remembers the recommendation for the summer program.  The historical sources she received were provided by the parents and Ranney.  She asked for documentation from C.C.'s time in Holmdel but was told that the District did not have it.  She did not remember seeing the progress reports and is not aware of what MAP testing is.  Dr. Brown did not investigate C.C.'s lack of academic progress and noted that her role was to evaluate C.C.'s current

Case 3:25-cv-00190-GC-JBD    Document 1-6    Filed 01/07/25    Page 11 of 27 PageID: 56
OAL DKT. NO. EDS 07732-24

state.  She stated that she is not a school psychologist; she makes clinical decisions, and she has not seen C.C. since her report was completed.

**K.C.** is C.C.'s mother.  She recalled sending Del Buono an email on January 28, 2022, (R-27 at 194) which informed her that she could not attend the parent-teacher conference and that her biggest concern was that C.C.'s grades were "not good."  C.C. was a completely different child at home, and while the parents "loved" Del Buono, C.C. was not learning.  They questioned whether it was a teacher issue or an issue with C.C. C.C. did not like school and did not want to go to the summer step up program.  K.C. and M.C. decided that they had to change the environment for C.C. since "something had to change."  K.C. stated that there was a consistent pattern that C.C was rushing through her work and the scores were questionable since she was guessing.  She added that C.C.'s visual processing disorder did not just come out of the blue.

On cross-examination, she agreed that the January 31, 2022, email from Del Buono (R-27 at 194–195) included the conference notes that would have been used in the parent-teacher conference that she was unable to attend.  She conceded that there was no further conversation until her May 26, 2022, email to Vitale (R-12) since "they had given up a little bit."  She also acknowledged that they did not make a demand for tuition reimbursement for Ranney until April 2024.

**M.C.** is C.C.'s father.  He helped C.C. daily with her homework and noticed that she would stare at the assignment.  Once he saw Dr. Brown's report, he stated that C.C.'s struggles made sense.  He described C.C. as intelligent but stated that she needs triggers to proceed.

## CREDIBILITY ANALYSIS AND ADDITIONAL FINDINGS OF FACTS

In evaluating evidence, it is necessary to assess the credibility of the witnesses. Credibility is the value that a finder of the facts gives to a witness' testimony.  It requires an overall assessment of the witness' story in light of its rationality or internal consistency and the manner in which it "hangs together" with the other evidence.  Carbo v. United States, 314 F.2d 718, 749 (9th Cir. 1963).  "Testimony to be believed must not

11

only proceed from the mouth of a credible witness but must be credible in itself," in that "[i]t must be such as the common experience and observation of mankind can approve as probable in the circumstances." In re Perrone, 5 N.J. 514, 522 (1950).

A fact finder "is free to weigh the evidence and to reject the testimony of a witness . . . when it is contrary to circumstances given in evidence or contains inherent improbabilities or contradictions which alone or in connection with other circumstances in evidence excite suspicion as to its truth." Id. at 521–22; see D'Amato by McPherson v. D'Amato, 305 N.J. Super. 109, 115 (App. Div. 1997). A trier of fact may also reject testimony as "inherently incredible" when "it is inconsistent with other testimony or with common experience" or "overborne" by the testimony of other witnesses. Congleton v. Pura-Tex Stone Corp., 53 N.J. Super. 282, 287 (App. Div. 1958).

Further, "'[t]he interest, motive, bias, or prejudice of a witness may affect his credibility and justify the [trier of fact], whose province it is to pass upon the credibility of an interested witness, in disbelieving his testimony.'" State v. Salimone, 19 N.J. Super. 600, 608 (App. Div.), certif. denied, 10 N.J. 316 (1952) (citation omitted). The choice of rejecting the testimony of a witness, in whole or in part, rests with the trier and finder of the facts and must simply be a reasonable one. Renan Realty Corp. v. Dep't of Cmty. Affairs, 182 N.J. Super. 415, 421 (App. Div. 1981).

In determining credibility, I am aware that the District employees would want to support the determination that C.C. was making meaningful progress with the Tier 1 interventions. I am also aware that petitioners believe that what they seek is in the best interest of C.C. In addition to considering each witness' interest in the outcome of the matter, I observed their demeanor, tone, and physical actions. I also considered the accuracy of their recollection; their ability to know and recall relevant facts and information; the reasonableness of their testimony; their demeanor, willingness, or reluctance to testify; their candor or evasiveness; any inconsistent or contradictory statements; and the inherent believability of their testimony.

After having the opportunity to review the evidence and observe the witnesses, I found **Dr. Lamoglia**, **Del Buono**, and **Vitale** to be impressive, knowledgeable, and

experienced.  They presented clear, professional, and believable testimony.  Further, I was persuaded by the expert testimony of Dr. Lamoglia and Del Buono that C.C. made meaningful progress and did not need additional supports and a referral to the CST. These expert opinions are supported by C.C.'s progress reports, MAP scores, Fountas and Pinnell scores, and the detailed May 31, 2022, email to the parents describing C.C.'s academic progress.

**K.C.** and **M.C.** are clearly dedicated and devoted parents to C.C. who presented detailed testimony regarding C.C.'s life at home and the issues she experienced in school.  It must be noted that both parents were fact witnesses, and their credible testimony is limited solely to the facts presented in their testimony, not their opinions.

Finally, **Dr. Brown** is an experienced psychologist who described her evaluation of C.C., which culminated in her diagnosis of a visual processing disorder.  The District conceded that it did not have a basis to dispute the diagnosis since they had no access to C.C. following her removal from the District.  (District Summation at 7.)  While Dr. Brown presented professional testimony, she became defensive when challenged on cross-examination regarding the methods she utilized in her evaluation.  Critically, she conceded that she did not review any of C.C.'s records from Holmdel, did not investigate her lack of academic progress as she described her role as "not investigative," did not remember looking at progress reports, and did not know what MAP testing is.  Accordingly, it is evident that her evaluation and diagnosis conducted in the summer of 2023, over a year after the parents removed C.C. from the District, and without any review of C.C.'s records during the 2021–2022 school year, are not germane to the issue in this matter, whether Holmdel failed to then identify and evaluate C.C. for special education purposes, thus neglecting its child-find and FAPE duties in 2022.

Accordingly, based on the foregoing, I **FIND** the expert opinions of Dr. Lamoglia to be persuasive that:  the evaluations did not indicate that additional supports were needed for C.C.; nothing in the reports (R-8; R-9) raised a red flag suggesting a need for special education services; Del Buono did not improperly fail to identify C.C. as a

OAL DKT. NO. EDS 07732-24

child in need of referral for evaluation by the CST; and that the progress documented in Del Buono's email response to the parents (R-14) was meaningful.

I **FURTHER FIND** the expert opinions of Del Buono to be persuasive that: she did not observe any adverse educational impact on account of a visual processing disability in C.C. or a need for any additional individualized instruction beyond Tier 1; C.C. made meaningful progress throughout the year with Tier 1 interventions, and therefore Tier 2 interventions were not necessary; while C.C. had some learning gaps in phonics, as many other students did, she made adequate progress in her reading comprehension skills and use of vocabulary, she was using the writing strategies taught to her, and she improved in use of phonics; spelling is the application of phonics, and C.C. continuously improved in spelling; and that she did not consider rushing through work to be a sign that C.C. had a visual processing disorder or any type of disability that was adversely affecting her education, overwhelming her, or leaving her unable to complete homework.

Based upon due consideration of the testimonial and documentary evidence presented at the hearing and having had the opportunity to observe the demeanor of the witnesses and assess their credibility, I also **FIND** as **FACT** the following:

1.  Following the 2019 determination that C.C. was not referred to the CST, the parents made no further requests for an evaluation by the CST. Dr. Lamoglia did not receive a request from the parents for C.C. to be evaluated prior to the April 23, 2024, email. (P-15.)

2.  Holmdel utilizes a three-tier system of support when assessing a student's progress and the potential need for intervention and referral services.

3.  Del Buono uses the tiered interventions to determine what is causing the issue when she identifies a student with difficulties. If tiers one through three are not successful, then a child may be referred to the CST.

OAL DKT. NO. EDS 07732-24

4.      During the 2021–2022 school year, Del Buono referred three students to the CST.  C.C. was not referred to the CST because Del Buono believed she was making adequate progress through the Tier 1 interventions.  Del Buono credibly testified that while improvement was needed in phonics and she received an "N" on her quarterly progress reports, C.C. scored average to above average in all areas.  Del Buono did not move C.C. to a Tier 2 intervention due to the progress she made with Tier 1 interventions.

5.      C.C.'s MAP scores were:  176 in mathematics and 162 in reading in the fall of 2020; 174 in mathematics and 172 in reading in the winter of 2020; 172 in mathematics and 169 in reading in the spring of 2021; 185 in mathematics and 185 in reading in the fall of 2021; 177 in mathematics and 182 in reading in the winter of 2021; and 200 in mathematics and 192 in reading in the spring of 2022.  These scores dipped in the winter and rose in the spring in the 2021–2022 school year.  (R-10.)

6.      Holmdel students demonstrated "a dip across the board" across all grade levels in winter 2022.

7.      Under the Fountas & Pinnell running records system, C.C. progressed from her beginning reading level H to level L.  This progress represented a full year's growth.  (R-14; R-20.)

8.      C.C. needed some reminders for using proper phonics and avoiding speeding through work.

9.      Del Buono saw no evidence that C.C. was struggling emotionally in school.

10.     While K.C. noted in her January 28, 2022, email notifying Del Buono that she could not attend the parent-teacher conference that "our biggest concern is that her grades are not good" (R-27 at 194), the parents did not express any further written or verbal concerns until their May 26, 2022,

15

OAL DKT. NO. EDS 07732-24

email. (R-12.) K.C. conceded on cross-examination that "they had given up a little bit."

11.    Del Buono's January 31, 2022, email response included the conference notes that would have been used in the parent-teacher conference that K.C. was unable to attend. (R-27 at 194–195.)

12.    Following the parent's May 26, 2022, email expressing concerns with C.C.'s academic progress, (R-12) Del Buono provided a detailed summary of C.C.'s academic growth via email on May 31, 2022. (R-14.) Del Buono credibly testified that this email was an accurate description of how C.C. was doing.

13.    Del Buono provided additional reading lists and spelling words to accommodate the requests of the parents.

14.    The May 22, 2022, email from the parents to Vitale (R-27 at 214–215) raised the possibility of C.C. being retained in second grade if she remained in the district. Del Buono did not believe that would be necessary for C.C., and she felt that it would do more harm than good socially and emotionally. However, Del Buono recommended that C.C. attend the Summer Step Up Program. While K.C. expressed an interest in the Summer Step Up program, the parents made the decision that C.C. would not attend. (R-14; R-15; R-16.)

15.    The parents did not make a tuition demand until their April 23, 2024, letter to the District. (P-15.)

## LEGAL DISCUSSION

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482, ensures that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and

16

independent living, and ensures that the rights of children with disabilities and parents of such children are protected.  20 U.S.C. § 1400(d)(1)(A), (B); N.J.A.C. 6A:14-1.1.  A "child with a disability" means a child with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities, and who, by reason thereof, needs special education and related services.  20 U.S.C. § 1401(3)(A).

States qualifying for federal funds under the IDEA must ensure all children with disabilities the right to a free "appropriate public education."  20 U.S.C. § 1412(a)(1); Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley, 458 U.S. 176 (1982).  Each district board of education is responsible for providing a system of free, appropriate special education and related services.  N.J.A.C. 6A:14-1.1(d).  A "free appropriate public education" (FAPE) means special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the state educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the state involved; and (D) are provided in conformity with the individualized education program required under 20 U.S.C. § 1414(d).  20 U.S.C. § 1401(9); Rowley, 458 U.S. 176. Subject to certain limitations, a FAPE is available to all children with disabilities residing in the state between the ages of three and twenty-one, inclusive.  20 U.S.C. § 1412(a)(1)(A), (B).

An individualized education program is a written statement for each child with a disability that is developed, reviewed, and revised in accordance with 20 U.S.C. § 1414(d); 20 U.S.C. § 1401(14); and 20 U.S.C. § 1412(a)(4).  When a student is determined to be eligible for special education, an individualized education program (IEP) must be developed to establish the rationale for the student's educational placement and to serve as a basis for program implementation.  N.J.A.C. 6A:14-1.3, -3.7.  At the beginning of each school year, the district must have an IEP in effect for every student who is receiving special education and related services from the district. N.J.A.C. 6A:14-3.7(a)(1).  Annually, or more often, if necessary, the IEP team must meet to review and revise the IEP and determine placement.  N.J.A.C. 6A:14-3.7(i).  A

FAPE requires that the education offered to the child must be sufficient to "confer some educational benefit upon the handicapped child," but it does not require that the school district maximize the potential of disabled students commensurate with the opportunity provided to non-disabled students. Rowley, 458 U.S. at 200. Hence, a satisfactory IEP must provide "significant learning" and confer "meaningful benefit." T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000).

The Supreme Court discussed Rowley in Endrew F. v. Douglas County School District RE-1, 580 U.S. 386 (2017), noting that Rowley did not "establish any one test for determining the adequacy of educational benefits," and concluding that the "adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." Id. at 394, 404. Endrew F. warns against courts substituting their own notions of sound education policy for those of school authorities and notes that deference is based upon application of expertise and the exercise of judgment by those authorities. Id. at 404. However, the school authorities are expected to offer "a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." Ibid.

Additionally, in accordance with the IDEA, children with disabilities are to be educated in the least restrictive environment (LRE). 20 U.S.C. § 1412(a)(5); N.J.A.C. 6A:14-1.1(b)(5). To that end, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are to be educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment should occur only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(a)(5)(A); N.J.A.C. 6A:14-4.2. The Third Circuit has interpreted this to require that a disabled child be placed in the LRE that will provide the child with a "meaningful educational benefit." T.R., 205 F.3d at 578. Consideration is given to whether the student can be educated in a regular classroom with supplementary aids and services, a comparison of benefits provided in a regular education class versus a special education class, and the potentially beneficial or

harmful effects that placement may have on the student with disabilities or other students in the class.  N.J.A.C. 6A:14-4.2(a)(8).

The school district bears the burden of proof whenever a due-process hearing is held pursuant to the provisions of the IDEA, chapter 46 of Title 18A of the New Jersey Statutes, or regulations promulgated thereto, regarding the identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action, of a child with a disability.  N.J.S.A. 18A:46-1.1.

At issue in this matter is whether, and to what extent, the District failed in May and June 2022 to identify C.C. as a disabled child eligible for special education and denied her a FAPE and whether, and to what extent, the petitioners may be entitled to tuition reimbursement for the costs of C.C.'s unilateral placement at Ranney for the 2022–2023 school year.

_Child Find and FAPE_

In J.M. v. Summit City Board of Education, 39 F.4th 126 (3d Cir. 2022), the Third Circuit Court of Appeals delineated the scope of these school district duties and the legal claims a parent may pursue if a school district shirks its duties.  As the court explained, "the IDEA places two significant responsibilities on school districts with respect to children with disabilities:  the child-find obligation and the duty to provide a free appropriate public education, commonly referred to as a 'FAPE,' to children with disabilities."  Id. at 137 (citing D.K. v. Abington Sch. Dist., 696 F.3d 233, 244 (3d Cir. 2012)).

First, "[t]he child-find obligation requires school districts to 'identif[y], locate[], and evaluate[]' all 'children with disabilities . . . who are in need of special education and related services.'"  Ibid. (citing 20 U.S.C. § 1412(a)(3)(A)).  In this way, "[a] school district has a duty to evaluate a child for a disability upon notice of behavior that is likely to indicate a disability."  Ibid. (internal quotation omitted).  And "[o]nce a school district has such a reasonable suspicion that a child has a disability, it has a reasonable time to evaluate 'the specific problems a potentially disabled student is having.'"  Ibid. (quoting

19

D.K., 696 F.3d at 250; citing Ridley Sch. Dist. v. M.R., 680 F.3d 260, 271 (3d Cir. 2012)).

In connection with the child-find obligation, "[t]he IDEA also imposes specific requirements for evaluating a child who is reasonably suspected of having a disability" such that "a school district must assess the child 'in all areas of suspected disability,' 20 U.S.C. § 1414(b)(3)(B), but that does not require the evaluation to be 'designed to identify and diagnose every possible disability[.]'" Ibid. (quoting D.K., 696 F.3d at 250). In addition, "a school district's assessment must seek to gain 'relevant information' about the 'educational needs of the child' to determine if the child needs special education and related services." Ibid. (quoting 20 U.S.C. § 1414(b)(3)(C)). And "[i]f a school district meets these statutory requirements for identifying, locating, and evaluating a child with disabilities, then it discharges its child-find obligation." Id. at 138.

Second, "[a]fter identifying a child with a disability who is also in need of special education and related services, a school district is obligated to provide a FAPE to the disabled child." Ibid. (citing 20 U.S.C. § 1412(a)(1)(A); 20 U.S.C. § 1401(3)). Thus, "[t]ogether, the child-find duty and the FAPE obligation require public schools to 'identify and effectively educate' disabled children." Ibid. (quoting P.P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 735 (3d Cir. 2009)).

Importantly, "[t]he IDEA creates a cause of action against a school district that fails to provide a FAPE to a child who has a disability and needs special education and related services." Ibid. (citing 20 U.S.C. § 1412(a)(1)(A); 20 U.S.C. § 1415(f)(3)(E)(i)–(ii), (i)(2)). And "[d]ue to the relationship between the child-find obligation and the duty to provide a FAPE, a denial-of-FAPE claim may be premised on a child-find violation." Ibid.

The court explained in J.M. that there are three parts to this claim:

> First, the child must have a disability for which he or she needs special education and related services. See 20 U.S.C. §§ 1412(a)(1)(A), . . . 1401(3)(A) . . . . Second, the school district must breach its child-find duty. See 20 U.S.C.

§ 1412(a)(3)(A); P.P., 585 F.3d at 738; Mr. P v. West Hartford Bd. of Educ., 885 F.3d 735, 750 (2d Cir. 2018). Third, the school district's child-find breach must impede the child's right to a FAPE, or, alternatively, the child-find breach must either "significantly impede[]" parental participation rights or "cause[] a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(I)-(III).

[Ibid.]

Here, the District argues that it did not violate its child-find responsibilities by failing to evaluate C.C. for special education services as it "presented credible and unrebutted evidence that any disability C.C. may have had did not adversely affect her educational performance – she made meaningful progress with non-special education 'Tier 1' interventions as demonstrated by numerous objective measures – and that she was not in need of special education and related services." (District Summation at 7–8.) Further, Dr. Brown's report "contains no analysis of C.C.'s performance in Spring 2022" and "none of her opinions regarding C.C.'s performance on testing administered in the Summer of 2023 or her classroom performance at Ranney in September 2023 would be relevant to the question of whether the District erred in failing to evaluate her for a suspected educational disability in 2022." (Id. at 8.) Finally, Del Buono "did not refer C.C. to the CST because C.C. made meaningful progress with Tier 1 interventions, as demonstrated by her Fountas and Pinnell scores, her MAP scores and her progress reports. As such, the District demonstrated with competent evidence that it did not violate C.C.'s 'child find' rights by failing to refer her to the CST for further evaluation." (Ibid.)

Conversely, the parents argue that "[t]his case clearly demonstrates the Holmdel School District's failure to meet its Child Find obligations during the 2021-2022 school year, ultimately denying C.C. her right to a Free Appropriate Public Education (FAPE) in 2022-2023. Despite numerous opportunities for the District to address the concerns raised by C.C.'s parents regarding her academic struggles and emotional well-being, the District neither evaluated C.C. nor convened an IEP meeting to address her needs." (Petitioner's Summation at 1.) The parents also contend that the "District improperly relied on [Response to Intervention] RTI strategies as a 'gate-keeping' mechanism to

delay evaluations" and improperly administered MAP tests, which they believe "artificially inflate scores and mask learning difficulties." (Id. at 8.)

The record has established that the parents first raised an issue with C.C.'s educational performance with Del Buono on January 28, 2022. (R-27 at 194.) Del Buono responded on January 31, 2022, with her notes that would have been used in the parent-teacher conference that K.C. was unable to attend. (R-27 at 194–195.) The parents did not express any further written or verbal concerns until their May 26, 2022, email. (R-12.) K.C. conceded on cross-examination that "they had given up a little bit." In response to the May 26, 2022, email, Del Buono provided a detailed summary of C.C.'s academic growth via email on May 31, 2022. (R-14.) Del Buono credibly testified that this email was an accurate description of how C.C. was doing.

In the intervening time between January and May 2022, Del Buono found that C.C. made meaningful progress throughout the year with Tier 1 interventions, and therefore, Tier 2 interventions were not necessary. Del Buono, and the District's other expert witness, Dr. Lamoglia, both persuasively testified that C.C. did not need additional supports, nothing raised a red flag demonstrating a need for special education services, and there was no observation of any adverse educational impact on account of a visual processing disability in C.C. Further, Del Buono did not improperly fail to identify C.C. as a child in need of a referral for evaluation by the CST. These expert opinions are supported by C.C.'s progress reports, MAP scores, Fountas and Pinnell scores, and the detailed May 31, 2022, email to the parents describing C.C.'s academic progress.

The parents' contention that C.C.'s MAP scores were artificially inflated and therefore masked her learning difficulties is unsupported by any documentary evidence or expert testimony. Further, the persuasive expert testimony of Dr. Lamoglia and Del Buono regarding the progress C.C. made throughout the 2021–2022 school year and which demonstrated that the Tier 1 interventions were working, refute the parents' argument that the District over relied on RTI.

OAL DKT. NO. EDS 07732-24

The parents' sole expert witness, Dr. Brown, diagnosed C.C. with a visual processing disorder after evaluating her over a year after the parents removed her from the District and placed her at Ranney.  Critically, she did not review any of C.C.'s records from Holmdel, did not investigate her lack of academic progress as she described her role as "not investigative," did not remember looking at progress reports, and did not know what MAP testing is.  In sum, while the District does not dispute Dr. Brown's diagnosis (District Summation at 7), her evaluation and diagnosis, which was made without any review of C.C.'s records during the 2021–2022 school year, are not germane to the issue in this matter.

Accordingly, based on the foregoing, I **CONCLUDE** that the District has demonstrated by a preponderance of the credible evidence that its child-find obligation has been satisfied.  Therefore, I must **CONCLUDE** that the parents' demand for tuition and costs reimbursement due to their unilateral placement of C.C. at Ranney for the 2022–2023 school year is **DENIED**.

## **ORDER**

It is hereby **ORDERED** that the parents' due-process petition is **DENIED** and is **DISMISSED**.

OAL DKT. NO. EDS 07732-24

This decision is final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514 (2024) and is appealable by filing a complaint and bringing a civil action either in the Law Division of the Superior Court of New Jersey or in a district court of the United States.  20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516 (2024).  If the parent or adult student feels that this decision is not being fully implemented with respect to program or services, this concern should be communicated in writing to the Director, Office of Special Education.


November 22, 2024

DATE                                                    **JACOB S. GERTSMAN**, ALJ t/a


Date Received at Agency:                          November 22, 2024


Date Mailed to Parties:


JSG/cab

24

OAL DKT. NO. EDS 07732-24

## APPENDIX

## Witnesses

For petitioners:

Lisa Vitale

K.C.

M.C.

For respondent:

Dr. Amanda Lamoglia

Alicia Del Buono

## Exhibits

Court:

C-1    Order on respondent's motion for summary decision, dated August 22, 2024

For petitioners:

P-1    Reply, May 17, 2024

P-2    HIB, November 20, 2021

P-3    Medical Exemption, October 21, 2021

P-4    Ranney School Intervenes, November 16, 2022

P-5    Neuro Evaluation, July–October 2023

P-6    Auditory Evaluation, February 20, 2024

P-7    ISP, December 1, 2023

P-8    Discovery (VMI), September 6–September 9, 2024

P-9    Discovery Communications Request, August 27–September 10

P-10   Discovery NJAC 6A 14-1.1 Special Education Regulations, September 10, 2024

P-11   Discovery NJAC 6A 14 Special Education, September 10, 2024

P-12   Discovery R2460.1 Child Find, September 10, 2024

OAL DKT. NO. EDS 07732-24

P-13   Discovery R2460.8 FAPE, Discovery R2460.8 FAPE

P-14   Motion for Discovery Response, September 10, 2024

P-15   Intent to Hold District Liable for Costs, April 23, 2024

P-16   HIB Investigation Results, April 23, 2024

P-17   United States Department of Education Memorandum Regarding Response to Intervention, January 21, 2011

For respondent:

R-1    Due Process Petition, May 6, 2024

R-2    Answer, May 14, 2024

R-3    Occupational Therapy Assessment, May 3, 2019

R-4    Educational Evaluation, May 10, 2019

R-5    Social History and questionnaire, May 13, 2019

R-6    Psychological Evaluation, May 21, 2019

R-7    Initial Eligibility Determination—Not Eligible, June 5, 2019

R-8    Progress Report, 2019–2020

R-9    Progress Report, 2020–2021

R-10   MAP scores, as of May 2, 2022

R-11   Not Admitted

R-12   Emails between Lisa Vitale and Petitioners, May 2022

R-13   Not Admitted

R-14   Emails between Petitioners and A. Del Buono, May / June 2022

R-15   Emails between Petitioners and Karen Bennett, June 2022

R-16   Email chain between Petitioners and A. Del Buono, June 2022

R-17   Ranney recommendation letter, June 14, 2022

R-18   Email from Petitioner to A. Del Buono, June 16, 2022

R-19   Progress Report, 2021–2022

R-20   Teacher notes on progress and performance, 2021–2022

R-21   Emails between Petitioner and A. Del Buono, June / July 2022

R-22   Ranney payment form, July 13, 2022

R-23   Ranney enrollment agreement, 2022–2023

R-24   Ranney School Payment Plan Confirmation, 2022–2023

R-25   Emails between Petitioners and District personnel, August 2022

OAL DKT. NO. EDS 07732-24

R-26  Order on Motion for Summary Decision, August 22, 2024

R-27  Additional emails between District staff and Petitioners, 2021–2022 (Pages 336–359, 392–399, 405–408, 410–413, 415–418, 496–541, 546 only.  The remaining pages in the exhibit were not admitted)

R-28  Research paper on Developmental Test of VMI

R-29  N.J.A.C. 6A:14-3.5

R-30  Curriculum Vitae—Amanda Lamoglia

R-31  Curriculum Vitae—Alicia Del Buono

R-32  Not Admitted